**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**UNITED STATES OF AMERICA**

    **v.**                               **Criminal No. 3:22cr81**

**KAASHIF NAAIL CLARK,**

        **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Kaashif Clark's Combined Motion to Suppress Evidence (the "Motion"). (ECF No. 47.)

On July 29, 2022, Clark first moved to suppress evidence recovered and statements obtained from his February 10, 2022 arrest. (ECF No. 26, at 1.) Without objection, Clark subsequently filed supplemental briefing moving to suppress statements made during his July 1, 2022 post-indictment interview with federal officials. (ECF Nos. 28-2, 35.) The United States responded. (ECF Nos. 27, 37.) Clark did not reply.

The Court heard evidence and oral argument on December 14, 2022. At the conclusion of that hearing and at the request of the parties, the Court ordered Clark to file a Combined Motion to Suppress that addressed all matters raised. Clark subsequently filed the instant Combined Motion to Suppress Evidence. (ECF No. 47.) The United States responded in opposition, and Clark replied. (ECF Nos. 49, 51.)

Thus, this matter is ripe for disposition. For the reasons articulated below, the Court will grant in part and deny in part Clark's Motion to Suppress. (ECF No. 47.)

## I. Procedural History and Findings of Fact

### A.    Procedural History

On June 7, 2022, a grand jury returned a three-count indictment against Clark, charging

him with Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18

U.S.C. § 922(g)(1) ("Count One"); Possession of a Machinegun, in violation of 18 U.S.C. §

922(o) ("Count Two"); and Possession with Intent to Distribute Fentanyl and Cocaine

Hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) ("Count Three").  (ECF

No. 3, at 1–2.)  On July 6, 2022, Clark appeared before the Court for arraignment.  (ECF No.

13.)  The Court issued a scheduling order for motions and a date for trial.  (ECF No. 25.)

On July 29, 2022, Clark timely filed his original Motion to Suppress Evidence arguing

that the Court must suppress the physical evidence and his statements from his arrest because

they were obtained pursuant to an unlawful detention and un-*Mirandized* interrogation in

violation of his Fourth[1] and Fifth[2] Amendment rights.  (ECF No. 26.)  The United States

responded in opposition and Clark did not reply.  (ECF No. 27.)

---

[1] The Fourth Amendment of the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[2] The Fifth Amendment of the United States Constitution states, in relevant part:

> No person . . . shall be compelled in any criminal case to be a witness against himself.

U.S. Const. amend. V.

2

On October 7, 2022, Clark requested leave from the Court to file an out-of-time supplement to his Motion to Suppress. (ECF No. 28.) The United States did not object. The Court granted the request. (ECF No. 34.) On October 14, 2022, Clark filed his supplemental briefing arguing that the statements from his post-indictment interview should be suppressed because he did not knowingly waive his *Miranda* rights. (ECF No. 35.) The United States responded to Clark's supplemental memorandum. (ECF No. 37.) Clark did not reply.

On December 14, 2022, the Court heard evidence and oral argument on Clark's Motion to Suppress Evidence. At the conclusion of that hearing and at the request of the parties, the Court ordered Clark to file a Combined Motion to Suppress that incorporated his arguments regarding both his February 10, 2022 arrest and July 1, 2022 post-indictment interview in one motion.

Clark then filed the instant Combined Motion to Suppress Evidence. (ECF No. 47.) Clark maintained his arguments that the Court must suppress the physical evidence and certain statements from his arrest and post-indictment interview because they were obtained pursuant to an unlawful detention, an un-*Mirandized* interrogation, and an invalid *Miranda* waiver in violation of his Fourth and Fifth Amendment rights. (ECF No. 47.) However, at the Court's direction, Clark identified the specific evidence and statements the Motion seeks to suppress. (ECF No. 47, at 3–4.) Clark's motion specifically seeks to suppress:

1. The Glock, Model 21, .45 caliber, semi-automatic pistol, bearing serial number AFWZ922, and accompanying ammunition and Glock conversion device recovered from . . . Clark's vehicle . . .

2. All controlled substances and paraphernalia recovered from . . . Clark's vehicle . . .

3. [Clark's] statement, "yes," in response to [Officer Berube's] question whether he is a convicted felon . . .

4.      [Clark's] statement, "yeah[,]" in response to Detective Melton twice stating that . . . Clark is a 13-time felon and should not be around firearms . . .

5.      All spontaneous statements made by . . . Clark during his arrest and transport to the Richmond City Jail on February 10, 2022 . . .[3]

6.      The entirety of the post-arrest interview on February 10, 2022 with the officers of the Richmond Police Department . . .

7.      The entirety of the post-[indictment] interview on July 1, 2022 by federal task force officers.

(ECF No. 47, at 3–4.)

_____

[3] Despite the Court ordering him to identify which statements he was, and was not, seeking to suppress, Clark identifies these statements largely by example rather than with specificity.

"During his arrest" is an ambiguous phrase that is difficult for the Court to discern what time period or statements Clark references. As such, the Court will, for clarity, refer to Clark's statements in groupings of time: (1) statements Clark made at the scene of his arrest after he was handcuffed but before receiving his *Miranda* warnings; (2) statements Clark made at the scene of his arrest after he received his *Miranda* warnings; (3) statements Clark made during his February 10, 2022 police transport and police interview after he received his *Miranda* warnings; and, (4) statements Clark made during his July 1, 2022 post-indictment interview.

As to the events in the alley and just afterward, Clark states argues that "[p]rior to his transport to the Richmond City Jail, [he] made spontaneous statements regarding the firearm and the car, including asking whether his girlfriend can come get the car." (ECF No. 47, at 15.) This suggests that other statements might be encompassed by the motion, but the record does not show what statements might be implicated. As to Clark's full interaction with the officers, the Court does not see as "spontaneous" all statements Clark made in addition to "yes" he is a convicted felon and "yeah" he is a 13-time felon. Some could be deemed incriminating.

As to the transfer, Clark merely states that he was "eventually transported to the Richmond City Jail by Officer Verbena, and he made potentially incriminating statements about the firearm." (ECF No. 47, at 15.) Clark does not identify what statements, spontaneous or not, he seeks to suppress regarding that car ride.

As to the post-arrest interview, Clark argues that "[h]e also made incriminating statements during a post-arrest interview with Detectives Fernandez and Melton." (ECF No. 47, at 15.) Clark cites Detective Melton's testimony that during the post-arrest interview, Clark "admitted that . . . someone left [the drugs] in the car, and he was holding it for them until they came to pick up the drugs. And then he also stated that the weapon that was in the car was for his safety." (Tr. 87:10–14.)

4

The United States responded in opposition. (ECF No. 49.) The United States maintains that Clark's statements regarding his felon status to Officer Berube and Detective Melton[4] are admissible, however, it agrees not to introduce the two statements at trial because Clark made post-*Miranda* warning statements that he knew he was a felon. (ECF No. 49, at 10.) Clark replied. (ECF No. 51.)

### B. Findings of Fact

#### 1. February 10, 2022 Arrest of Rawkea Pryor

On February 10, 2022, Detective Johnson of Richmond Police Department's ("RPD") Special Investigations Division ("SID") arranged for the arrest of Rawkea Pryor, the target of an ongoing drug trafficking investigation. (Tr. 13:5–8.)

##### a. Richmond Police Department's Investigation of Pryor

In October 2021, RPD both received a "drug complaint" about drug dealing and investigated a shooting at the same intersection of Meadow Street and Cary Street: the 2000 block of West Cary Street. (Tr. 7:9–15.) A witness to the shooting provided pictures and a video of the shootout. (Tr. 7:16–18.) Detective Johnson identified that Pryor was one of the individuals involved in the shooting. (Tr. 7:18–19.)

In approximately December 2021, RPD officers developed a confidential, reliable informant.[5] The informant told Detective Johnson that Pryor was on pretrial home "electronic

---

[4] "[Clark's] statement, 'yes,' in response to [Officer Berube's] question whether he is a convicted felon . . . [and Clark's] statement, 'yeah[,]' in response to Detective Melton twice stating that . . . Clark is a 13-time felon and should not be around firearms." (ECF No. 47, at 4.)

[5] As specified in earlier briefing, RPD officers conducted surveillance of Pryor and "watched him engage in a hand-to-hand [drug] transaction," again at the intersection of Meadow Street and Cary Street. (ECF No. 27, at 2.) The officers stopped the "other party" of the transaction and "recovered the crack cocaine that [they] just purchased from [Pryor]." (ECF No. 27, at 2.) The "individual reported that [they] bought [drugs] from [Pryor] regularly." (ECF No.

monitoring," (Tr. 26:2–5), and Johnson learned that Pryor had what is known as a "Fourth

Amendment waiver on file," (Tr. 8:14–15). The Fourth Amendment waiver was a "stipulation

for [Pryor] to get out on bond" in a pending Richmond City Circuit Court case; essentially

providing "that he could be searched pretty much at any time." (Tr. 8:16–22; ECF No. 47, at 5.)

Through the confidential informant and surveillance of Pryor, RPD learned that Pryor

drove a white Chevy Equinox, (Tr. 8:7–10), that every time the informant "dealt with [Pryor], he

would have a firearm either in the center console or between the center console and the driver's

seat," (Tr. 12:24–13:4), and that Pryor usually left his house around 8:00 or 8:30 a.m. to park in

an alley near the same intersection at Meadow Street and Cary Street. (Tr. 9:9–23).

Detective Johnson's investigation led him to believe that Pryor was dealing heroin,

crack, and fentanyl and he saw Pryor engage in "[w]ell over [ten]" suspected drug deals in the

alleyway. (Tr. 8:4–6; 26:22–25.) While he generally did not see the exchange of money or

drugs, Detective Johnson witnessed, "throughout several surveillances," individuals in the alley

"walk up to [Pryor's] car, reach their hand into the window, and come out hand clenched and

walk off." (Tr. 26:10–17.) Detective Johnson "knew some of the [individuals approaching

Pryor's car] to be drug addicts" from his time working in the area from 2004 until 2015. (Tr.

26:18–21.) In December of 2021, RPD, using their informant, conducted a "controlled buy" of

illegal narcotics from Pryor, meaning the transaction was conducted under law enforcement

supervision, at the 2200 or 2300 block of West Cary Street. (Tr. 18:22–19:7).

**b.    Richmond Police Department's Detention of Pryor**

On February 10, 2022, RPD planned to conduct Pryor's arrest. (Tr. 13:5–8.) The plan

was for a team of uniformed officers from RPD's First Precinct Focus Mission Team ("FMT") to

---

27, at 2.) The individual ultimately agreed to act as an informant for RPD and to "conduct[] a
controlled buy" from Pryor. (ECF No. 27, at 2.)

6

"conduct a traffic stop" on Pryor for driving with a suspended license. (Tr. 13:22–14:5.) On the morning of February 10, 2022, Detective Johnson led a briefing and provided the FMT officers with the "background of the investigation, a little history about . . . Pryor, the criminal history of . . . Pryor[,] . . . that he had a Fourth Amendment waiver on file[,] . . . [a] picture of . . . Pryor . . . , a picture of [Pryor's car], a tag of the [car,] . . . his history of leaving the house and where he usually goes[,] . . . that he[ is] known to carry a firearm, and the location of the firearm." (Tr. 14:11–20; 15:3–7.) The operational overview given to the FMT officers reported that their "objective" was to "stop [Pryor] after he began[] to deal drugs" and notes that "Pryor is known to carry a firearm and usually keeps it in or around the center console or between the driver's seat and the center console." (Govt. Ex. 2, at 1.) The planned location for Pryor's arrest was the alleyway where Detective Johnson had observed Pryor engaged in suspected drug deals because the officers could "approach from both ends . . . [a]nd it would be safer away from the public." (Tr. 15:10–15.)

After the officers were briefed, they began surveillance outside of Pryor's home. (ECF No. 49, at 3.) Pryor's white Chevy Equinox "arrived at the home, driven by an unknown man." (ECF No. 49, at 3.) "Pryor came out of [his] house with a dark colored book bag [and] placed it in the rear of the car. The [unknown man] who was driving got in the passenger seat and . . . Pryor got in the driver's seat." (Tr. 17:4–10.) After dropping off the passenger, Pryor drove to the alleyway at the intersection at Meadow Street and Cary Street that was the identified site of Pryor's previous drug dealing. (Tr. 17:11–18.)

Once Pryor had entered the alleyway, Detective Johnson "instructed the two marked [FMT] units to go ahead and move in and detain [Pryor]." (Tr. 17:20–23.) At approximately 8:21 a.m., Officers Novak, Davenport, Verbena, Berube, and Butler approached Pryor from

7

opposite sides of the alleyway. (ECF No. 47, at 9; ECF No. 49, at 3; Govt. Ex. 3A, at 8:21:06.) Once the officers had entered from each end of the alleyway, no cars could leave the alley because of the narrow thoroughfare. (Tr. 24:8–25.) From the passenger seat of the FMT car approaching from South Rowland Street, Officer Verbena saw Pryor "basically leaning inside [a white] Lexus" holding what he believed to be marijuana based on his training and experience. (Tr. 34:7–11; 35:2–8; Govt. Ex. 3A, at 8:21:14.) Officer Butler, who approached from the opposite end of the alley, South Meadow Street, saw Pryor "drop a . . . few quantities of suspected marijuana . . . [from] his hand." (Tr. 56:13–19.) Officer Butler estimated there were "about quarter ounce quantities" of suspected marijuana in each bag and Officer Berube believed Pryor to have "about an ounce" in total. (Tr. 57:5–12; Tr. 74:3–8.) Officer Berube believed that the officers had "interrupted a narcotics transaction." (Tr. 74:15–16.) When the officers reached the white Lexus, Officers Novak and Davenport detained Pryor and walked him away from the car. (Tr. 36:12–14; Govt. Ex. 3A, at 8:21:23–53.)

## 2.    Clark's February 10, 2022 Arrest

Clark was in the driver's seat of the white Lexus that Pryor was standing next to. (ECF No. 47, at 11.) While Officers Novak and Davenport detained Pryor, Officer Verbena turned his attention to Clark. (Tr. 35:19–22; Govt. Ex. 3A, at 8:21:22.)

### a.    Officer Verbena Requests Clark's Keys and Identification

While Officers Novak and Davenport detained Pryor, Officer Verbena asked Clark to turn off the Lexus and to hand him the keys to the car. (Tr. 35:19–23; Govt. Ex. 3A, at 8:21:22–32.) Officer Verbena reached into the car, removed the keys from Clark's car, and placed them on the car's roof. (Govt. Ex. 3A, at 8:21:33–51.) Officer Verbena took Clark's keys because in his "experience [RPD] ha[s] had people take off . . . while [the police are] investigat[ing]." (Tr.

8

35:22–25.) Officer Verbena then asked for Clark's identification pursuant to "standard practice." (Govt. Ex. 3A, at 8:21:42; Tr. 36:3–6.)

### b.   Officers Verbena and Berube Direct Clark to Exit the Vehicle, Handcuff Him, and Pat Him Down

While Officer Verbena reviewed Clark's identification, Officers Berube and Butler arrived and walked around the Lexus. (Tr. 37:4–8, 74:9–13; Govt. Ex. 7A, at 8:22:06.) Officer Berube "saw a scale in the cupholder" of the backseat and pointed it out to the other officers. (Tr. 74:17–19; Govt. Ex. 7A, at 8:21:57.) The scale indicated to Officer Berube that it was "possibly used for narcotics, [either to] weigh[] out the narcotics for sales or distribution," or when purchasing. (Tr. 75:1–5.) Officer Butler told the officers to "go ahead and detain him" and Officer Verbena asked Clark to step out of the car. (Govt. Ex. 5A, at 8:22:10; Govt. Ex. 3A, at 8:22:12.) When Clark got out of his vehicle, Officers Verbena and Berube put him in handcuffs and patted him down for weapons. (Govt. Ex. 3A, at 8:22:31–44.) Officer Verbena kept a grip on Clark's arm as he exited the vehicle. (Govt. Ex. 3A, at 8:22:31.) Officer Berube can be heard instructing Clark to "stop" as he is handcuffed, although it appears, and Clark states, that he was not resisting. (Govt. Ext. 3A, at 8:22:16–24.) Clark was removed from his Lexus just over one minute after officers reached his car.

### c.   Officer Butler Discovers the Firearm and Officer Berube Questions Clark

With Clark out of the car, Officer Butler was able to "observe[] the area where [Clark had been] seated and a black semi-automatic pistol was wedged in between the driver's seat and the center console."[6]  (Tr. 60:14–19, Govt. Ex. 6.) Officer Butler alerted Officers Verbena and

---

[6] Officer Butler testified that he suspected that Clark may have a gun because as Clark was exiting his vehicle, Officer Butler "observed [Clark] touch . . . his beltline with his hand, which [Officer Butler] recognized . . . to be cons[ist]ent with somebody checking [] the possibility of a weapon being secured in their waistband area." (Tr. 59:23–60:11.) Clark argues

Berube to the presence of the firearm, by asking them, "you see that gun tucked in?" (Govt. Ex. 3A, at 8:22:48). Officer Berube then asked Clark if he was a felon. (Govt. Ex. 3A, at 8:22:54.) Officer Berube asked Clark the question specifically because of Officer Butler's discovery of the firearm. (Tr. 75:14–16.) Clark replied, "[y]es ma'am. This ain't my car though . . .that's my girl's." (Govt. Ex. 3A, at 8:22:55–23:06.) At approximately 8:23 a.m., Officer Berube called a dispatch line, Teletype, to confirm that Clark was a felon. (Govt. Ex. 7A, at 8:23:31; Tr. 75:17–22.)

While Officer Berube was on the phone, Officer Butler told Clark, "it's fine man, we'll take care of all that man, I appreciate you being straight up." (Govt. Ex. 3A, at 8:23:06–10.) Officer Verbena asked Clark's where his girlfriend was. (Govt. Ex. 3A, at 8:23:09–10.) Clark responded to both officers by informing them that the gun belonged to his girlfriend and was in her name and that she was at home. (Govt. Ex. 3A, at 8:23:06–12.) Officers Butler and Verbena continued to ask Clark questions such as, "is there anything else you're not supposed to have? Anything in the car?" and "Nothing [you aren't supposed to have] in the bookbag or anything like that?" (Govt. Ex. 3A, at 8:23:32–58.)

Officer Butler held Clark by the arm throughout the conversation and asked Officer Verbena to hold Clark when Officer Butler had to step away. (Govt. Ex. 3A, at 8:24:25.) Officer Verbena later allowed Clark to sit down, but at least one officer always remained standing over him. (Govt. Ex. 3A, at 8:25:04.)

---

that this serves as an example of post-hoc rationalization because Clark was in fact moving his cell phone. (ECF No. 51, at 3, n.1.)

   The Court need not rely on this statement to make its finding that the pat down of Clark was reasonably undertaken. Butler did not conduct the pat down; Officers Verbena and Berube were the ones interacting directly with Clark.

### d.    Recovery of the Firearm and Clark's Volunteered Statements

Shortly after 8:25 a.m., Detective Melton and other RPD detectives arrived at the scene.

(Govt. Ex. 8A, at 8:25:29.)[7]   Ultimately, there were "well over [ten armed] officers" at the scene

of Clark's arrest and several marked and unmarked police cars at the scene.  (ECF No. 47, at 13;

Tr. 65:19–66:1.)  Clark asked Officer Verbena, "you really got everybody out here like this? It's

that serious?" and Officer Verbena responded affirmatively.  (Govt. Ex. 3A, at 8:24:56.)

Officer Verbena instructed Detective Melton not to search the car beyond removing the

gun while Officer Berube was confirming Clark's felon status.  (Govt. Ex. 8A, at 8:25:43–50; Tr.

43:5–10.)  Detective Melton walked up to the already-open driver side door of the Lexus and

retrieved the firearm.  (Govt. Ex. 8A, at 8:26:53–27:04.)  Detective Melton took photos of the .45

caliber Glock, which had a conversion device on it (a "Glock switch") allowing it to fire fully

automatically.  (Govt. Ex. 8A, at 8:27:04–11; Tr. 61:20–62:8.)  At 8:26 a.m., Officer Berube told

Detective Melton she would "run the gun" and Clark stated that "it should come back to Jazmia

Winston."  (Govt. Ex. 7A, at 8:26:35–44.)

Shortly after Detective Melton retrieved the firearm from the vehicle, Officer Verbena

stated, "you could search the car, you're right I guess because he's got an arrest . . . he's

admitting to being a felon."  (Govt. Ex. 8A, at 8:28:21–27.)  Throughout the interaction, the RPD

officers repeatedly referred to Clark's statement that he is a felon as an admission, rather than a

biographical or descriptive statement.

At 8:28 a.m., approximately seven minutes after the encounter with Clark had begun,

Officer Berube announced that she had confirmed Clark was a felon and explained that he had

---

[7] The timestamps in Detective Melton's body-worn camera video are in "Zulu" time, which is five hours ahead of Eastern Standard Time in February.  (Tr. 80:13–21.)  The Court converts these timestamps to military Eastern Standard Time for clarity.

thirteen felony convictions.  (Govt. Ex. 7A, at 8:28:20, 8:29:15; Govt. Ex. 8A, at 8:29:20.)  She

also confirmed that the firearm was not stolen.  (Govt. Ex. 8A, at 8:31:22.)

### e.   <u>Detective Melton Searches the Vehicle and Discovers Drugs</u>

After Officer Berube announced the Teletype confirmation of Clark's felon status, at

approximately 8:33 a.m., Detective Melton began a search of Clark's vehicle.  (Govt. Ex. 8A,

at 8:34:00.)  In the center console, Detective Melton found "a second firearm magazine and a

baggie with suspected drugs and lottery tickets."  (ECF No. 49, at 5; Govt. Ex. 8A, at 13:34:14–

22, Govt. Ex. 9.)  The second magazine "matched the other magazine of the weapon that was

taken out" of the car.  (Tr. 84:19–22.).  The Virginia Department of Forensic Science Lab

determined that the powder contained cocaine and fentanyl.[8]  (Tr. 84:2–9.).

### f.   <u>Detective Melton Formally Advises Clark He is Under Arrest and Issues *Miranda* Warnings</u>

At 8:36 a.m., more than fourteen and one-half minutes into the encounter, Detective

Melton advised Clark that he was under arrest.  (Govt. Ex. 8A, at 8:36:03.)  Before he arrested

him, however, Detective Melton and Clark then engaged in a conversation, in which Clark

reiterated that the gun belonged to his girlfriend and Detective Melton replied, "you're a thirteen

time felon dude, . . . you're not supposed to be nowhere looking at a gun."  (Govt. Ex. 8A,

at 8:36:06.)  When Clark protested that he was driving his girlfriend's car, Detective Melton

replied, "and you knew it was a gun there too.  You're not supposed to be around a gun."  (Govt.

Ex. 8A, at 8:36:17.)

Detective Fernandez then reminded Detective Melton that they had not read Clark his

*Miranda* rights.  (Govt. Ex. 8A, at 8:36:24.)  Detective Melton replied, "I know.  I'm just letting

---

[8] As identified in earlier briefing, the Virginia Department of Forensic Science later
tested the substances and "determined that they contained: (1) 11.82 grams of heroin and
fentanyl; (2) 11.6 grams of cocaine; and (3) .813 [grams] of fentanyl."  (ECF No. 27, at 5.)

him know he is under arrest," and then read Clark the *Miranda* warnings at approximately

8:36 a.m.  (Govt. Ex. 8A, at 8:36:24, 8:37:02.)

After Clark was read his *Miranda* rights, Clark engaged in a four-minute conversation

with Officer Verbena and an unnamed officer regarding his criminal record and his possession of

the firearm and marijuana.  (Govt. Ex. 3A, at 8:39:20–43:30.)  Clark was transported to the

Richmond City Jail by Officer Verbena and he "made potentially incriminating statements about

the firearm" during that trip.  (ECF No. 47, at 15.)  These statements are not identified on this

record.

### g.    Clark's Statements During the Post-*Miranda* Interview

At 2:15 p.m., approximately six hours after his arrest, Detectives Melton and Fernandez

interviewed Clark at the police station.  (Govt. Ex. 10A, at 14:18:30; Tr. 86:7–12.)  Before

starting the interview, Detective Melton "reminded Clark [that he had been read] his *Miranda*

rights [and] confirmed that Clark understood."  (ECF No. 49, at 6; Govt. Ex. 10A, at 14:18:38.)

In the interview, Clark first claimed that the Lexus was not his car, (Govt. Ex. 10A,

at 14:19:19), that the gun was his girlfriend's, (Govt. Ex. 10A, at 14:22:06), and that he did not

know anything about the drugs found in the Lexus' center console, (Govt. Ex. 10A, at 14:28:05).

Clark said that he knew his girlfriend owned the firearm and that there was a possibility it could

be in the vehicle, but that he did not know for sure it was in the vehicle or that it was between the

driver's seat and center console.  (Govt. Ex. 10A, at 14:27:24–55.)

When questioned about the events leading up to his arrest, Clark mentioned that he was

smoking marijuana when Pryor approached his vehicle.  (Govt. Ex. 10A, at 14:40:45.)

Therefore, Clark was under the influence throughout the police interaction.

Later in the interview, detectives confronted Clark with the fact that the Lexus'

registration was under his name.  (Govt. Ex. 10A, at 14:55:12.)  Clark then admitted that he had

13

the gun for his protection, (Govt. Ex. 10A, at 15:28:04; Tr. 87:13–14), and that the drugs were left by someone, and he was in the process of returning them. (Govt. Ex. 10A, at 15:04:33; Tr. 87:10–13.)

### 2.   Clark's July 1, 2022 Arrest

On June 7, 2022, approximately four months after his February 10, 2022 arrest, a federal grand jury charged Clark with possession of a firearm by a convicted felon, possession of a machinegun, and possession with the intent to distribute fentanyl and cocaine. (ECF No. 3.) The Court issued an arrest warrant for Clark that earlier briefing states was executed by police officers during a traffic violation stop on July 1, 2022. (ECF No. 6; ECF No. 37, at 1–2.) On July 1, 2022, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Task Force Officer ("TFO") Michael Kielb and Drug Enforcement Administration ("DEA") Task Force Officer Shane Watson took custody of Clark and transported him to an ATF office. (ECF No. 49, at 6.)

### a.   Clark's Post-Indictment Interview by Federal Officers

At the ATF office, TFOs Kielb and Watson interviewed Clark. (Tr. 93:9–11.) TFO Kielb asked Clark a few preliminary biographical and processing questions, and then issued Clark his *Miranda* warnings by reading from an ATF Advice of Rights and Waiver form. (Govt. Ex. 11, at 00:52–11:41.)[9] TFO Kielb asked Clark if he understood and Clark "indicat[ed] with his hands like to hand over the paper and the pen. That he was willing to sign." (Tr. 95:21–96:3.) TFO Kielb then stated the waiver form was "not an admission of anything, all that [it does is] . . . recognize your rights and if you want to talk, you can talk, and if not, that's your right to." (Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 11:49.)

---

[9] The timestamps of the audio recording in Government's Exhibit 11 refer to the duration of Clark's interview at the ATF office, not the time of day. (Tr. 95:11–14.)

Clark responded by saying, "so why, what is this 'waiver,' I ain't tryin' to waive my rights." (Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 12:00.) TFO Kielb replied:

> it's basically saying if you want to talk to us now, you're waiving your right. So[,] you either have your lawyer here with you, you can discuss this with a lawyer before talking to me, or you can talk right now without your lawyer. If you talk without your lawyer you're saying you[] waive . . .that right to have them here.

(Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 12:06.) Clark cuts TFO Kielb off by saying, "yeah, yeah – I understand–. . .yeah, I ain't –." (Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 12:23.) TFO Kielb concludes by saying, "you're not waiving any other rights except to have counsel here present at this time" and then Clark signed the waiver form. (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:25.)

After signing the waiver, Clark asked, "you understood what I was sayin' though, right? I won't, I just won't trying to waive my um, my rights, basically." (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:40.) Clark and TFO Kielb talk over each other, but Kielb can be heard saying, "No, no, no. And what's going to happen here . . . I'm not going to try to trick you into anything . . . I want to have honest conversation right here and, um, I would—this is where you can help yourself out, okay?" (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:46–13:04.)

The interview continued with Clark making several potentially incriminating statements. (Govt. Ex. 11B, at 3–6; Govt. Ex. 11A, at 13:04–1:07:50.) Clark, Kielb, and Watson discussed the charges against Clark, whether the RPD officers had probable cause to stop him, how Clark's cooperation could affect Sentencing Guidelines, and how the owner of a firearm is not the only one who can possess it. (Govt. Ex. 11B, at 2–6, Govt. Ex. 11A, at 13:04–50:12.) Although the United States touts Clark's claims that he studied federal law during his time in prison to suggest Clark understood his *Miranda* rights, Clark mentioned his studies while expressing surprise at

15

his clear misunderstanding of firearm possession, so the Court does not credit his studies much weight. (Govt. Ex. 11A, at 49:39.)

**C.    Summary of the Present Suppression Motion**

In his Motion to Suppress, Clark contends that on February 10, 2022, the RPD officers violated his Fourth Amendment rights against unreasonable seizures by detaining him in an investigative stop ("*Terry* stop") without reasonable articulable suspicion that he was engaged in criminal activity. (ECF No. 47, at 18–30.) This unreasonable seizure, Clark argues, began either when the FMT officers blocked the exits of the alleyway with their police cars or when Officer Verbena asked Clark to turn off his car and hand over his keys. (ECF No. 47, at 20–22.) To remedy this violation of his Fourth Amendment rights, Clark seeks to exclude all evidence obtained during the unreasonable seizure, as well as any evidence derived therefrom. (ECF No. 47, at 30.)

Clark also seeks to suppress incriminating statements he made at the scene of his February 10, 2022 arrest and during his interview at the police station later that day based on the RPD officers' failure to provide him with *Miranda* warnings in violation of his Fifth Amendment protections against self-incrimination. (ECF No. 47, at 30–32.) These incriminating statements include Clark's affirmative responses to Officer Berube's and Detective Melton's custodial interrogation regarding his felon status and statements he made regarding ownership of the Lexus before he was given a *Miranda* warning. (ECF No. 47, at 30–32.) Although Clark was later given a *Miranda* warning and submitted to an interview with detectives, he argues these statements are "fruit of the poisonous tree" stemming from earlier constitutional violations. (ECF No. 47, at 30–35.)

Finally, Clark argues that he did not give a knowing waiver of his *Miranda* rights during his July 1, 2022 post-indictment interview with federal officials and therefore his statements were obtained in violation of the Fifth Amendment.  (ECF No. 47, at 32–34.)  Clark asserts that "due to TFO Kielb's inaccurate description of [the waiver that] . . . Clark was signing", he did not have full awareness of the nature of the right to remain silent being abandoned and the consequences of abandoning it.  (ECF No. 47, at 34.)  Clark therefore requests that the statements obtained during his interrogation by federal officers be suppressed.  (ECF No. 47, at 34.)

## II.  Analysis

The Court will deny in part and grant in part Clark's Combined Motion to Suppress. (ECF No. 47.)  The RPD officers did not unconstitutionally seize Clark, nor did they unconstitutionally search his vehicle.  Thus, the Court will deny the Combined Motion to Suppress as to the physical evidence obtained from the search.

The Court will grant Clark's Combined Motion to Suppress as to the statements Clark made after being handcuffed, but before receiving his *Miranda* warnings, because the officers could not have inevitably discovered evidence of Clark's knowledge as to his felon status and the firearm.  The Court will not suppress any other statements Clark made on the day of his arrest, at the scene or in his RPD interview, after he received his *Miranda* warnings.

Finally, the Court will also grant Clark's Combined Motion to Suppress as to the statements he made during his post-indictment interview.

### A.     Officers Seized Clark at the Moment Clark Perceived their Police Cars Blocking Both Alley Exits

As a preliminary matter, the Court concludes that the RPD officers' seizure of Clark began at the moment Clark perceived the two police cars entering (and therefore blocking the

17

exits of) the alley because that amounted to a show of authority sufficient to implicate the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 551–52 (1980).

### 1.    Legal Framework: Seizure by Show of Authority

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  The Fourth Amendment's protections, however, "do[] not extend to all police-citizen encounters." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Jones*, 678 F.3d 293, 298–99 (4th Cir. 2012)).  "[O]nly when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). When physical force is absent, "a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted)).

To determine whether law enforcement officers have displayed a show of authority sufficient to implicate the Fourth Amendment, a court applies the objective test outlined in *Mendenhall*, 446 U.S. 544. *Id.*  "The police have done so 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave.'" *Id.* (quoting *Mendenhall*, 446 U.S. at 554).  Cases in the United States Court of Appeals for the Fourth Circuit "have enumerated six broad, non-exclusive categories of facts that may be relevant" to a court's analysis of the circumstances surrounding the incident: (1) how many officers were present; (2) whether officers were in uniform and/or displayed firearms; (3) whether any officer touched the defendant or made any attempt to block or restrain his movement; (4) whether the officer's questioning was conversational rather than intimidating;

(5) whether the officer informed the defendant that the officer suspected [the defendant] of illegal activity, or treated the encounter as routine; and, (6) whether the officer asked for identification and how quickly the officer returned it to the defendant. *United States v. Cloud*, 994 F.3d 233, 242–43 (4th Cir. 2021) (citing cases).

An "unintended person", *i.e.*, an individual that law enforcement officers did not intend to target with a show of authority, may nevertheless be seized if officers did so "through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254, 260–61 (2007) (finding that the passenger of a car stopped on the road was seized even though the law enforcement officer intended to investigate only the driver, directed the show of authority at only the driver, and was not aware the car had a passenger prior to the stop, because both "occupants were subject to like control by the successful display of authority"). However, the "unintended person" must be aware of the show of authority in order to "perceive[] that the show of authority [is] at least partly directed at him [or her]" and effectively be seized. *Cloud*, 994 F.3d at 243 (finding that parking a police car behind the defendant's car was a show of authority but that the defendant was not seized without evidence that the defendant perceived the show of authority given that he was not in his car at the time).

For a seizure to occur, "the defendant must actually submit to [the law enforcement officer's] show of authority." *Cloud*, 994 F.3d 233 at 242 (citing *Stover*, 808 F.3d at 995). "That submission need not be explicit; it can take the form of 'passive acquiescence.'" *Id.* When determining whether a defendant has submitted to a show of authority through "passive acquiescence, the relevant test . . . is that enunciated in *Mendenhall*." *Stover*, 808 F.3d at 995–96 (quoting *Brendlin*, 551 U.S. at 255 (internal quotation marks omitted)). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing [person]

19

is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262 (finding that the passenger of a stopped car "had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside").

### 2. The Officers' Blocking of the Alleyway's Only Exits Was a Sufficient Show of Authority to Constitute a Seizure of Clark and Clark Submitted to the Show of Authority

The RPD officers seized Clark in his parked vehicle when they effectuated the detention of Pryor by entering the alleyway from both ends, resulting in the blockage of the sole two exits to leave the parking lot. (ECF No. 47, at 9; ECF No. 49, at 3; Govt. Ex. 3A, at 8:21:06; Tr. 24:8–25:2.) Consideration of the totality of the circumstances reveals that a reasonable person would not have felt free to leave after they perceived the officers pull into, and block off, the alleyway. *See United States v. Mendenhall*, 446 U.S. 544 (1980); *Cloud*, 994 F.3d at 243. Clark submitted to this show of authority by staying inside his car. *See Brendlin*, 551 U.S. at 262.

### A. Blocking Both Alleyway Exits with Police Cars is a Sufficient Show of Authority to Implicate the Fourth Amendment

Clark argues that the RPD officers seized him the moment that the officers entered the alleyway "from both sides, effectively blocking the egress out of the alley." (ECF No. 47, at 22.) The Court agrees that the RPD officers blocking the only alleyway exits with police cars is a sufficient show of authority to implicate the Fourth Amendment. However, Clark was not seized until he could perceive the police cars in the alleyway. *See United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015); *Cloud*, 994 F.3d at 243.

On the morning of Clark's arrest, the RPD officers followed their target, Pryor, from his home to the alleyway at the intersection at Meadow Street and Cary Street. (ECF No. 49, at 3;

20

Tr. 17:4–18.)  Once Pryor had entered the alleyway, Detective Johnson "instructed the two marked [FMT cars] to go ahead and move in and detain [Pryor]." (Tr. 17:20–23.)  At approximately 8:21 a.m., Officers Novak, Davenport, Verbena, Berube, and Butler approached Pryor from opposite sides of the alleyway.  (ECF No. 47, at 9; ECF No. 49, at 3; Govt. Ex. 3A, at 8:21:06.)  Once the officers had entered from each end of the alleyway, no cars could exit the alley because of the narrow thoroughfare.  (Tr. 24:8–25:2.)

The RPD officers blocking the alleyway's exits demonstrated a show of authority sufficient to implicate the Fourth Amendment and effectuate a seizure because a reasonable person would not have felt free to leave under the circumstances.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Fourth Circuit has come to the same conclusion under similar circumstances in *Stover*.  808 F.3d at 996–97.  In *Stover*, police officers observed a car double-parked in the "small private parking lot of an apartment building" at 1:00 a.m. and decided to investigate.  *Id*. at 993.  The officers "pulled [their] marked police vehicle into the lot and parked at a 45-degree angle about three feet behind the [double-parked car], blocking it in." *Id*.  The officers also activated the police car's emergency lights to notify the driver that the police car was behind him.  *Id*.  The Fourth Circuit found that under that circumstance "it [was] not a close question" as to whether a reasonable person would feel free to leave and that the officers used "aggressive conduct from the start of their interaction with Stover [in an] effort . . . to try to effect . . . a seizure."  *Id*. at 996–97; *see also United States v. Jones*, 678 F.3d 293, 302–03 (4th Cir. 2012) (finding a seizure because "when an officer blocks a defendant's car from leaving the scene . . . , the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation").

21

Similar to Stover, Clark was in his parked vehicle in the small parking lot in the alleyway when RPD officers pulled their two marked police vehicles into the alleyway and parked such that Clark was blocked in and could not exit the alleyway if he tried. (ECF No. 47, at 9; ECF No. 49, at 3; Govt. Ex. 3A, at 8:21:06; Tr. 24:8–25.) While the officers did not activate the emergency lights of their police cars, the timing of Clark's seizure in the early morning suggests that lights would be unnecessary to alert to the officers' presence in the parking lot. In addition, the RPD officers were purposefully acting with a show of authority to effectively detain their target, Pryor. Although Clark was not the intended subject of the show of authority, he was subject to the same level of control (*i.e.,* an inability to leave the alleyway) as a result of the officers' intentional actions. *See Brendlin v. California*, 551 U.S. 249, 254, 261 (2007). Given the totality of the circumstances, the Court concludes that a reasonable person would not have felt free to leave and, therefore, the RPD officers displayed a show of authority sufficient to implicate the Fourth Amendment.

The Court cannot, however, find that clark was seized the moment that the officers entered the alleyway. The aerial image of the alleyway in the Government's Exhibit 1 and the footage from the officers' body worn cameras show that there is a lapse of time between the officers' turns into each side of the alleyway and when Clark would perceive the police vehicles and the fact that he was blocked in. (Govt. Ex. 1; Govt. Ex. 3A, at 8:20:56–21:03; Govt. Ex. 7A, at 8:21:00–07.) In order to be effectively seized, Clark must have been aware of the show of authority in order to "perceive[] that the show of authority [is] at least partly directed at him." *See United States v. Cloud*, 994 F.3d 233, 243 (4th Cir. 2021). Therefore, Clark was seized at the moment that he was able to perceive the police cars in the alleyway.

**b.    Clark Submitted to the Show of Authority by Remaining in His Car**

By remaining in his car, Clark submitted to the RPD officers' show of authority, as is required to find Clark was seized. *See Stover*, 808 F.3d at 995; *Brendlin*, 551 U.S. at 262.

"[W]hat may amount to submission depends on what a person was doing before the show of authority" and in Clark's circumstances he could submit to the officers' show of authority only by keeping his car parked and remaining inside. *See Brendlin*, 551 U.S. at 262 (finding that the passenger of a car submitted to show of force because once the car was stopped "he could, and apparently did, submit [to authority] by staying inside"). From the moment Clark perceived the officers' entrance into the alleyway until Officer Verbena approached his window, Clark did not act to leave his car or the scene. (Govt. Ex. 3A, at 8:21:03–22.)

Therefore, Clark submitted to the RPD officers' show of authority, requiring the Court to find that he was seized at that time.

**B.    The Investigatory Stop Was Legitimate at Its Inception Because the Officers Had a Reasonable, Articulable Suspicion that Clark Was Engaged in a Drug Transaction**

The Court finds the investigatory stop of Clark lawful at its inception because the experienced RPD officers witnessed Pryor, a targeted drug dealer who held and dropped drugs when police arrived, interacting with Clark through his car window. This occurred after a months' long investigation had uncovered (through surveillance and the use of a confidential informant) that Pryor, usually armed, regularly distributed drugs through car windows, in that same alley, at that time of morning. This gave the officers a reasonable, articulable suspicion that Clark was engaged in a drug trafficking transaction. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

23

1.    **Legal Framework:  Investigatory Stops**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST.

amend. IV.  The Fourth Amendment's "protections extend to brief investigatory stops of persons

or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

(citing *Terry*, 392 U.S. at 9).  These protections allow an officer to lawfully stop and briefly

detain a person for investigative purposes (a "*Terry* stop") when the officer has a "reasonable,

articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 123; *Sokolow*, 490

U.S. at 7; *Terry*, 392 U.S. at 30.

"Reasonable suspicion" is a "less demanding standard than probable cause and requires a

showing considerably less than a preponderance of the evidence." *Wardlow*, 528 U.S. at 123.

To satisfy the standard, an officer need only "point to specific and articulable facts, which, taken

together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*,

392 U.S. at 21.  The suspicion must also be objectively reasonable based on those facts. *United

States v. Cortez*, 449 U.S. 411, 417–18 (1981).

To determine whether an officer had such a specific, articulable, and objective basis to

"'suspect[] legal wrongdoing,' 'reviewing courts . . .must look at the totality of the circumstances

of each case'" based on the facts known to the officer at the time of the seizure. *United States v.

Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018) (quoting *Arvizu*, 534 U.S. at 273).  The facts available

at the time of the seizure "must be seen and weighed . . . as understood by those versed in the

field of law enforcement." *Cortez*, 449 U.S. at 418 (finding that objective facts that would be

meaningless to the untrained, afford a legitimate basis for suspicion when used by trained law

enforcement officers); *see also Arivzu*, 534 U.S. at 273 (stating that officers can "draw on their

24

own experience and specialized training to make inferences from and deductions about cumulative information available to them that 'might well elude an untrained person'").

Reasonable suspicion "does not deal with hard certainties, but with probabilities," so "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir.), *cert. denied*, 553 U.S. 1061 (2008) (each of an officer's articulated facts *on its own* is not required to eliminate every innocent traveler and establish reasonable suspicion). Courts apply "commonsense and [a] contextual approach in evaluating the validity of an investigatory detention." *United States v. McBride,* 676 F.3d 385, 392 (4th Cir. 2012).

While an officer's "mere hunch," *Arivzu*, 534 U.S. at 274, or reliance on an uncorroborated anonymous tip, *United States v. Brown*, 401 F.3d 588, 595–96 (4th Cir. 2005), insufficiently supports "reasonable suspicion," the standard is not a particularly onerous one. *See, e.g., McCoy*, 513 F.3d at 412–13 (experienced officer's observation of vehicles moving between parking lots where drug sales had previously occurred and without occupants entering the stores sufficient to constitute reasonable suspicion).

> **2.      The Officers Had a Reasonable, Articulable Suspicion that Clark Was Engaged in a Drug Transaction Because They Observed Clark's Interaction with a Pryor, a Known Drug Dealer, That Was Consistent With their Investigation as to the Time, Place, and Manner of Pryor's Past Drug Distribution Activities**

The RPD officers had reasonable suspicion to seize Clark in his parked vehicle because they witnessed him engage with a targeted drug dealer, known to carry a weapon, in his identified car (the Equinox), at the same time (the morning) and place (the alleyway) and in the same manner (through a car window) that dealer was known to sell drugs. (ECF No. 49, at 2–3.) Additionally, Pryor visibly dropped three separate baggies containing marijuana when approached. (ECF No. 49, at 3.) Consideration of "the totality of the circumstances," as

25

understood by those versed in the field of law enforcement, reveals that the officers had a reasonable, articulable suspicion that Clark was engaged in drug trafficking, which supported the investigatory action. *United States v. Kehoe*, 893 F.3d 232, 237 (2002) (quoting *Arvizu*, 534 U.S. at 273); *United States v. Cortez*, 449 U.S. 411, 418 (1981).

Although the Court has found that Clark was seized the moment that Clark perceived the two police cars entering, and therefore blocking the exits of, the alley he was parked in, Clark has offered no evidence that he perceived the RPD officers before they witnessed Clark's interaction with Pryor, who was acting fully in accord with RPD's previous observations of his drug distributing activity. *See United States v. Vasquez*, 604 F. Supp. 3d 330, 334 (E.D. Va. 2022) ("On a motion to suppress, the burden is on the party who seeks to suppress the evidence."). The Court therefore concludes that Clark's seizure happened contemporaneously with the RPD officers' perception of the facts underlying their reasonable suspicion.

The United States suggests that the officers had reasonable suspicion at this time based on: (1) the officers' experience in narcotics investigations and drug transactions; (2) their knowledge of Pryor as a drug dealer after a months-long investigation; and, (3) the facts they gathered at the scene of Pryor's arrest. (ECF No. 49, at 12–13.) The Court agrees and will address these factors in turn.

### A.    Officers' Extensive Experience in Narcotics Investigations and Drug Transactions Merits Substantial Weight

To start, the Court notes that the officers most directly involved with Clark during this event bought extensive narcotics investigative knowledge and training with them. For instance, Detective Johnson began serving in the Special Investigations Division ("SID") of the RPD, focusing on narcotics, in 2015. (Tr. 6:8–14.) Prior to that, Detective Johnson's various duties included patrol and serving in a street crimes unit on the Third Precinct's Focus Mission Team

26

("FMT") that specialized in "drugs." (Tr. 6:15–24.)  He had seen "numerous" drug transactions in the alley where Clark's arrest occurred. (Tr. 20:5–10.)  Detective Johnson has observed hundreds of suspected drug transactions during his time at the Richmond Police Department in addition to the well over ten suspected drug transactions he observed conducted by Pryor. (Tr. 26:22–25; 28:22–25.)

Officer Stephen Butler similarly had extensive experience in drug investigations.  Before being assigned to the Richmond Police Academy to train others, he had spent ten years at the RPD working on a Focus Mission Team for the First Precinct, *where this very operation was conducted*, specializing in investigating violent crimes and drug trafficking. (Tr. 52:1–22.)  He estimated that, at the time of Clark's arrest, he had observed "[w]ell over a hundred, if not hundreds" of suspected drug deals. (Tr. 52:23–25.)

Officer Erika Berube has been employed with the Richmond Police Department over eleven years and, and at the time of her testimony, had worked on the FMT for the First Precinct, *where this operation was conducted*, for nine or ten years. (Tr. 70:2–12.)  Officer Berube focused her work on drugs and violence that occur in the First Precinct, as well as some property crimes. (Tr. 70:13–18.)  During her testimony, she "low-ball[ed]" an estimate of witnessing twenty to fifty suspected drug transactions. (Tr. 70:19–25.)

Finally, Detective Demetrium Melton has served for the Richmond Police Department for over  nineteen years. (Tr. 78:22–24.)  He worked on the Third Precinct FMT for three years and began working for the Special Investigations Division (narcotics) in 2014, where he has been assigned since. (Tr. 79:2–12.)

This experience allows the officers to make reasonable assumptions about what they saw at the scene of Clark's arrest.  Any attempt by Clark to diminish the Officers' ability to

reasonably say they witnessed a drug transaction cannot prevail.  The fact that they did not see a hand-to-hand transaction between Pryor and Clark does not, based on their experience, vitiate their ability to conclude a drug transaction occurred.

In addition, all officers had significant experience in Focus Mission Teams that specialize in narcotics investigations in the area.  This alone counters any claim that their experience was not articulated in a way applied to the facts of this case.  (ECF No. 51, 6.)  Indeed, three officers, Detective Johnson, Officer Butler, and Officer Berube, had worked or were working in the First Precinct that included the alleyway.  Specific to this case, Detective Johnson testified that he knew that Pryor was dealing narcotics when surveilling him because "some of the people that [Pryor] had interaction with I had arrested them before.  I worked that area for – from 2004 until 2015, so I kind of knew some of the people [interacting with Pryor] to be drug addicts.  (Tr. 26:18–20.)

As such, it was amply reasonable for the experienced officers on the scene to develop a suspicion that Pryor was involved in a drug transaction with Clark.

### b.    Officers' Knowledge of Pryor's Earlier Drug Dealing Merits Substantial Weight

The officers' prior knowledge of Pryor from a months-long investigation strongly supports their reasonable suspicion that Clark was engaged in drug trafficking.

At the time of Clark's seizure, RPD had tracked Pryor's movements and confirmed that Pryor dealt drugs daily.  (ECF No. 49, at 12.)  Detective Johnson, who has observed hundreds of suspected drug transactions during his time at RPD, had observed Pryor engage in well over ten suspected hand-to-hand drug transactions in the past several months and had recovered narcotics from a buyer who reported they purchased drugs from Pryor regularly.  (Tr. 8:4–6; 26:22–25; ECF No. 27, at 2.)  That buyer also conducted a controlled buy of illegal narcotics from Pryor on

28

behalf of RPD prior to the date of Clark's arrest. (Tr. 7:23–24.) Pryor was reported as carrying a gun in or near his center console. (Govt. Ex. 2, at 1.) The information gathered by RPD throughout their investigation allowed the officers effectuating Pryor's arrest to know that Clark was engaging with a drug dealer.

Further, the investigation of Pryor led RPD to learn that he often conducted drug deals in the alleyway behind Reams Market and that he often went there to deal in the morning. (Tr. 9:9–23; 26:22–25.) Detective Johnson testified that the Pryor's "main location" where he "would hang out [] would be in the south alley in the 2000 block of West Cary." (Tr. 9:12–17.) Therefore, when RPD officers followed Pryor to the alleyway behind Reams Market on the morning of February 10, 2022, and saw him engage with Clark, these actions nearly directly mirrored the time, place and manner of Pryor's months-long observed pattern of drug trafficking. Every officer in the February 10, 2022 operation had been briefed on Pryor's background and drug trafficking patterns. (*See* Govt. Ex. 2.) The officers' knowledge about Pryor specifically, combined with their experience in narcotics investigations, supports their reasonable belief that Clark's engagement with Pryor was a drug transaction. Indeed, given the officers' credible testimony, the Court might conclude that based on the totality of the circumstances, a contrary finding might have been non-commonsensical or unreasonable.

## c.    **Officer Observations at the Scene Merit Substantial Weight**

The observations of the officers at the scene of Clark's arrest are also entitled to substantial weight.

The officers at the scene of Pryor's "takedown" saw that Pryor was holding an amount of marijuana consistent with distribution as he stood near Clark's car window. (Tr. 56:13–19; 57:5–12; 74:3–8.) While possession of marijuana in small quantities is not illegal in Virginia,

the sale of marijuana remains prohibited. *See* Va. Code Ann. § 18.2-248.1. All officers, based on their experience in law enforcement, testified credibly that they reasonably believed they were witnessing a drug sale. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). (ECF No. 49, at 13 ("All three officers testified that, in their training and experience, they saw what they suspected was a drug deal." *See* Tr. 34:20–35:13; 58:10–11; 74:15–16).) The Court finds that belief to be reasonable. The fact that all officers at the scene came to the same conclusion helps support a finding of reasonableness.

Clark suggests a number of innocent scenarios that could explain what the RPD officers witnessed as they entered the alleyway, such as Pryor simply possessing a legal amount of marijuana while speaking to Clark or "adult sharing" of marijuana between the two. (ECF No. 47, at 26–29.) Clark argues that without more information, such as witnessing the marijuana or money changing hands, the officers had nothing more than a "hunch" that Clark was engaged in a drug deal. (ECF No. 47, at 22.)

These arguments cannot prevail. Officers are not required to eliminate every innocent explanation for the scene they witnessed to establish reasonable suspicion. *See United States v. McBride*, 676 F.3d 385, 389, 392 (4th Cir. 2012) (concluding that, even though an officer did not see the hand-to-hand exchange, based on his experience and other factors, reasonable articulable suspicion existed); *see also United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008) (holding that each of an officer's articulated facts *on its own* are not required to eliminate every innocent traveler to establish reasonable suspicion).

As the Fourth Circuit explained in *McCoy*, police officers do not necessarily need to observe drugs or money changing hands to support reasonable suspicion of a drug deal. *McCoy*, 513 F.3d at 412–13. Of course, one would think that those exchanging illegal drugs would

deliberately do so in a manner others could not see.  Even presuming that the amount of

marijuana Pryor dropped was within the one ounce he could legally possess, its division into

separate bags is not inconsistent with distribution.  Most convincingly, the totality of information

the officers knew about Pryor – that he had dealt crack cocaine, heroin, and fentanyl, that he

often carried a weapon, and that his conduct on February 10, 2022 was consistent with his drug

trafficking activity law enforcement had observed for months – suggests that any finding that the

officers' suspicion was based solely on Pryor's possession of marijuana would be counterfactual.

If the officers could not see a hand-to-hand marijuana transaction with Clark, their belief that

Pryor was providing Clark with another narcotic would be reasonable.

     As in *McBride* and *McCoy*, at least two of the officers here had experience observing

drug deals in the alleyway.  More pointedly, unlike the *McBride and McCoy* officers, the officers

here had specific knowledge that one of the individuals was, in fact, a drug dealer who regularly

carried a firearm and conducted drug transactions in that alley.

A reasonable officer could therefore interpret Clark and Pryor's interaction in the same way the

RPD officers did:  as a drug deal.

### d. The Totality of the Circumstances Gave Rise to Reasonable Suspicion that Clark Was Engaged in a Drug Transaction

     Under the totality of the circumstances, the officers had reasonable suspicion that Clark

was engaged in a drug transaction.  During a scheduled arrest of a known drug dealer, the RPD

officers observed Pryor, the target, engage with Clark while holding quantities of marijuana

consistent with distribution.  The officers had reasonable suspicion to believe that Pryor was

selling or buying marijuana or narcotics (rather than possessing it or sharing it) because their

earlier investigation uncovered that he was a crack cocaine, heroin, and fentanyl drug dealer who

frequented the specific alleyway in the mornings to deal drugs through open car windows.

Clark's interaction with Pryor occurred in the location where Pryor was known to distribute drugs, at the time he was known to do so, and in a manner he had done so before.   This encounter would justify an officer in this position to reasonably suspect that Clark was buying drugs from Pryor.  Accordingly, the officers legally detained Clark in an investigatory stop.

**B.    The Officers Did Not Unreasonably Pat Down Clark and Search His Vehicle During the Investigatory Stop Because the Officers Had Reasonable Suspicion to Believe that Clark was Armed and Dangerous**

Because the officers had reasonable suspicion to believe that Clark was armed and dangerous based on their knowledge of Pryor's armed drug trafficking, their reasonable belief that Clark had just engaged in an illegal drug transaction with Pryor, and Officer Berube's plain view of a scale which, in her experience, are used for drug transactions, they did not violate Clark's constitutional rights by asking him to get out of the car, patting him down, and searching his vehicle.  The search of Clark's vehicle based on the officers' belief he was armed and dangerous was further supported by the firearm in plain view when Clark got out of his car.[10]

**1.    Legal Framework: Searches During Investigatory Stops**

If during an investigative stop the officer reasonably believes the suspect may be armed and dangerous, the officer may conduct a frisk and limited search for weapons.  *See Terry v.*

---

[10] The firearm in plain view was a Glock .45 with a switch on it to make the firearm fully automatic.  Such a switch makes the firearm *per se* illegal to own, whether the owner is a felon or not.  Once the officers saw the Glock .45 with the switch they also had "probable cause to believe Clark's car contained "contraband or evidence of criminal activity," such that they could search without a warrant.  *See, e.g., California v. Carney*, 471 U.S. 386, 394–95 (1985) (warrantless search of stationary motor home valid because police had probable cause after corroborating tip that occupant was selling drugs); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) (warrantless automobile search valid because police had probable cause after seeing occupants engage in drug transactions); *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (warrantless automobile search valid because police had probable cause after smelling marijuana and drug dog alerting); *see also Chambers v. Maroney*, 399 U.S. 42, 50–52 (1970) (Vehicles are inherently "readily movable" even if the vehicle is temporarily restricted or potential drivers have been secured.).

*Ohio*, 392 U.S. 1, 27 (1968).  To determine whether an officer had reasonable suspicion to justify

a frisk, the Court examines the totality of the circumstances, with due weight given to "the

specific reasonable inferences [the officer] is entitled to draw from the facts in light of his

experience," for a particularized and objective basis to believe the suspect was armed and

dangerous.  *Id.*

> Further, where the individual suspected of being armed and dangerous is
>
> an occupant or recent occupant of a vehicle at the initiation of a *Terry* stop, and
> where the police reasonably believe . . .that there may be readily-accessible
> weapons in [their] vehicle . . .a protective search of the vehicle for weapons [is
> authorized], provided the police harbor a reasonable belief that the suspect may
> gain access to the vehicle at a time when that access would endanger the safety of
> the officers conducting the stop or of others nearby– including the reasonable
> belief that the suspect will return to the vehicle following the conclusion of the
> *Terry* stop.

*United States v. Holmes*, 376 F.3d 270, 280–81 (4th Cir. 2004).

Courts have identified a nexus between drugs and firearms that allows for a suspicion of

drug trafficking to support a reasonable suspicion of the suspect being armed.  *See, e.g., McCoy*,

513 F.3d at 412–14; *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997) ("As we have

often noted, where there are drugs, there are almost always guns.").  The showing of an officer's

"appropriate level of suspicion of criminal activity and apprehension of danger" required to

justify a frisk or search "may be satisfied by an officer's objectively reasonable suspicion that

drugs are present in a vehicle that he [or she] lawfully stops."  *United States v. Sakyi*, 160 F.3d

164, 169 (4th Cir. 1998).

33

**2.      The Officers Had Reasonable Suspicion to Justify the Pat Down of Clark and Search of His Vehicle Because They Knew of Pryor's Armed Drug Dealing and Officer Berube Saw a Scale in the Back Seat of Clark's Car**

After the officers initiated their investigatory stop of Clark, Officer Verbena directed Clark to exit his vehicle. (Govt. Ex. 5A, at 8:22:16; Govt. Ex. 3A, at 8:22:12.) The investigatory stop was initiated after the officers had been told in the operational overview that they would stop Pryor in the alley "after he beg[i]ns to deal drugs" and that Pryor was "known to carry a firearm." (Govt. Ex. 2, at 1.) The officers had also just witnessed what they reasonably believed to be Clark's illegal exchange of drugs with Pryor and observed a scale in the backseat of Clark's car.

The RPD officers initiated the investigatory stop of Clark because, as previously identified, they had reasonable suspicion to believe he was engaged in drug trafficking. *See* Part II.A.2, *supra.* Officer Verbena did not ask Clark to get out of his car until after the officers saw Clark interact with Pryor and *after* Officer Berube saw the scale in his backseat. In their testimony, the officers confirmed that their experience in law enforcement mirrors what has been identified in some cases as a nexus between drugs and firearms. (Tr. 40:11–21; 58:16–19; 60:9–11.) Certainly, a nexus had plainly been identified as to Pryor and his distribution of narcotics. The RPD officers at the scene of Clark's arrest all knew, through reported surveillance and informant information, that Pryor "is known to carry a firearm" and keep it near the center console of his car. (Govt. Ex. 2, at 1.) It was reasonable for the officers to believe that if Clark was engaged in drug trafficking with a known target who operated armed, Clark might be armed as well.

Once Clark was out of the car, Officers Verbena and Berube handcuffed Clark and conducted a pat down of his person. (Govt. Ex. 3A, at 8:22:31–47.) Consideration of the

"totality of the circumstances," with "due weight . . . given" to "the specific reasonable inferences [the officers were] entitled to draw from the facts in light of [their] experience," reveals that the officers had a reasonable suspicion that Clark was armed and dangerous, which supported Clark's pat down. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Under the law, the RPD officers also had the right to conduct a protective search of the vehicle as part of their investigatory stop once they had reasonable suspicion Clark was armed and dangerous and a reasonable belief there may be readily-accessible weapons in the vehicle. *See United States v. Holmes*, 376 F.3d 270, 280–81 (4th Cir. 2004). As Clark exited his car, Officer Butler observed – just one and a half minutes into Clark's interaction with RPD – a readily accessible firearm in plain view tucked between the driver's seat and center console. (Tr. 60:14–19; Govt. Ex. 5A, at 8:22:50.) *See United States v. Cherry*, 920 F.3d 1126, 1137–38 (7th Cir. 2019) (finding probable cause to seize narcotics and satchel because items were in plain view within defendant's vehicle when defendant opened driver's side door). Although Clark was handcuffed and in the control of the officers throughout the search, the officers "harbor[ed] a reasonable belief that [he] may gain access to the vehicle" after the conclusion of the investigatory stop and would therefore pose a threat to officer or public safety. *See Holmes*, 376 F.3d at 280–81. Therefore, once the firearm was seen in plain view, the officers had further support to legally search Clark's vehicle.

The totality of the circumstances demonstrate that the officers had ample and near immediate first-hand knowledge that Clark was armed, and in combination with a reasonably suspected drug transaction, was dangerous. Based on their specific knowledge of Pryor and their experience as narcotics investigators the officers had reasonable suspicion that Clark would be armed while engaging in drug trafficking with an armed drug dealer. The officers had not just a

reasonable suspicion but also, swiftly after approaching, visual confirmation that Clark's vehicle contained a readily accessible firearm after discovering the Glock .45 caliber firearm in plain view where Clark has just been sitting.

## C.     The Officers Improperly Subjected Clark to Custodial Interrogation Without Reading Him His *Miranda* Rights

The Court will grant Clark's Motion to Suppress as to some of the statements he made at the time of his arrest because the RPD officers subjected Clark to custodial interrogation without providing him with *Miranda* warnings.

### 1.     Legal Framework: The Fifth Amendment's Protection Against Self Incrimination

The Fifth Amendment assures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  To protect this right against self-incrimination, the United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436 (1966), "adopted prophylactic procedural rules that must be followed during custodial interrogations." *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).  To that end, generally, "any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior *Miranda* warnings have been given." *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (citations omitted).

To establish that an individual is "in custody," and therefore requires *Miranda* warnings, the Court must determine whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted).  This test operates by asking whether, viewed objectively, "a reasonable [person] in the suspect's position would have understood [their] situation" as being "in custody." *Id.* at 422.  "[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *United States v.*

36

*Hashime*, 734 F.3d 278, 283–85 (4th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (internal quotation marks and citations omitted)) (holding that despite the defendant's cooperative and calm tone and demeanor, other objective factors soundly demonstrated that he was "in custody" for *Miranda* purposes).

Factors relevant to a Court's analysis of whether a reasonable individual would believe they are "in custody" can include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002).

Once an individual is in custody, *Miranda* protections extend only to "interrogation" of the suspect, which is defined as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).   The functional equivalent of interrogation consists of "words or actions on the part of the police . . .that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.   Some methods of questioning that are not considered interrogation and do not require *Miranda* warnings exist.   Both routine booking questions, *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990), and casual conversation or statements of law enforcement agents about evidence which were not designed to illicit an incriminating response, *United States v. Payne*, 954 F.2d 199, 201–03 (4th Cir. 1992), do not constitute interrogations for *Miranda* purposes.

### 2.      Clark Was in Custody When He Was Handcuffed

The RPD officers' investigative stop of Clark did not initially trigger Clark's Fifth Amendment protection against self-incrimination.   However, once Clark was ordered out of his

vehicle and handcuffed by Officers Verbena and Berube, Clark's detention curtailed his freedom

of action "to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440

(1984).

The United States contends that Clark was not in custody until Detective Melton formally

advised Clark that he was under arrest. (ECF No. 49, at 17–18.) While each single police

action, even that of "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car

for questioning, or using or threatening to use force does not *necessarily* elevate a lawful stop

into a custodial arrest," *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998), (emphasis

added) (citing *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995)), the totality of the

circumstances in Clark's case would lead "a reasonable [person to] . . .have understood [their]

situation" as being "in custody,[11] *See Berkemer*, 468 U.S. at 442.

As Clark sat in his vehicle, with Pryor at his window, two police cruisers swiftly entered

the alleyway from opposite ends. (ECF No. 47, at 9; ECF No. 49, at 3; Govt. Ex. 3A, at

8:20:40.) Five officers quickly approached the pair. (Govt. Ex. 3A, at 8:21:12.) Officers Novak

and Davenport immediately handcuffed Pryor and led him away, which would suggest to a

reasonable person that the police were present for a serious matter. *Compare with United States

v. Azua-Rinconda*, 914 F.3d 319, 326–27 (4th Cir. 2010) (defendant not in custody in part

because defendant was at home and able to sit with spouse). (Govt. Ex. 3A, at 8:21:19.)

---

[11] The United States describes the RPD officers' interaction with Clark as "three officers
approach[ing] Clark in a public parking lot in the daytime and briefly detain[ing] him to
investigate suspected drug dealing." (ECF No. 27, at 17.)  But well over ten armed officers and
several police cars, marked and unmarked, were at the scene. (ECF No. 47, at 13; Tr. 65:22–
66:1.)  Considering all of the relevant factors, the Court finds the detention scene to be a greater
substantive operation than the United States' description would suggest.

Officer Verbena asked Clark to turn off the vehicle and took his keys from him. (Tr. 35:19–22; Govt. Ex. 3A, at 8:21:22.) Although Officer Verbena was speaking in a "relaxed and conversational tone," (ECF No. 27, at 17), this practice inserted police restraint into the stop. *See Florida v. Bostwick*, 501 U.S. 429, 436 (1991) (distinguishing between background restraint and police restraint, finding that *Miranda* warnings were not required where the defendant's inability to leave was because he was on a bus rather than police restraint); *United States v. Giddins*, 858 F.3d 870, 880 (4th Cir. 2017) (defendant in custody despite voluntarily entering police station for seized car and being told he was free to leave because only unlocked exit was behind detective, detective twice moved phone away from defendant, and defendant believed interrogation's end would have prevented recovery of car).

Officer Berube immediately –before a minute had passed in the interaction– pointed out the scale in Clark's backseat, which presented Clark with mounting evidence against him. (Tr. 74:11–19; Govt. Ex. 7A, at 8:22:04.) It was only *after* Officer Berube's discovery that Clark was asked to get out of the car. Officer Butler added to the evidence against Clark when he alerted Officers Verbena and Berube to the existence of the firearm in the vehicle where Clark had been sitting, still within one minute of the start of the interaction. *See United States v. Guillen*, 995 F.3d 1095, 1110–11 (10th Cir. 2021) (defendant in custody despite questioning at home after voluntarily allowing officers in the house because questioning followed search of home and officers used accusatory tone when presenting defendant with evidence discovered during their search); *United States v. Slaight*, 620 F.3d 816, 822 (7th Cir. 2010) (defendant in custody despite voluntarily going to police station in part because defendant knew officers had enough evidence to arrest). (Govt. Ex. 3A, at 8:22:48; Tr. 41:7–10.)

In addition, Officer Butler told the officers they should "go ahead and detain [Clark]," which to a reasonable person would signal a migration in the interaction from investigatory to custodial. *Compare with United States v. Hargrove*, 625 F.3d 170, 178–82 (4th Cir. 2010) (suspect who was advised in his kitchen that he was not under arrest and that he was free to leave at any time was not "in custody" given nature of conversation and freedom of movement allowed). (Govt. Ex. 5A, at 8:22:10; Govt. Ex. 3A, at 8:22:10.)

When Officer Verbena ordered Clark to get out of his car, Officers Verbena and Berube kept physical contact over Clark's arm and immediately put him in handcuffs and patted him down for weapons. *Compare United States v. Cowan*, 674 F.3d 947, 957–58 (8th Cir. 2012) (defendant was in custody despite only being subjected to an investigatory stop because defendant was detained, handcuffed, patted down, questioned, and not told of freedom to leave or to abstain from answering questions), *with United States v. Uzenski*, 434 F.3d 690, 704–05 (4th Cir. 2006) (defendant, a police detective, not in custody because he voluntarily went to police station, was allowed to use the restroom, was told he was not under arrest, was not restrained, was offered refreshments, was not subject to a display of weapons, and the door remained unlocked during questioning). (Govt. Ex. 3A, at 8:22:15–47.)

Clark could see multiple officers searching Pryor's vehicle and additional detectives arriving on the scene. (Govt. Ex. 8A, at 8:25:29.) Ultimately, there were "well over [ten armed] officers at the scene of Clark's arrest" and several marked and unmarked police cars at the scene. (ECF No. 47, at 13; Tr. 65:22–66:1.) Indeed, the number of officers prompted Clark to ask Officer Verbena – at approximately 8:24 a.m. – if the situation were "that serious" and Officer Verbena responded affirmatively. *See United States v. Newton*, 369 F.3d 659, 675–77 (2d Cir. 2004) (defendant parolee in custody despite questioning in his home and being told he was not

under arrest because defendant was handcuffed and questioned by six officers).  (Govt. Ex. 3A, at 8:24:56.)

Notably, once Detective Melton formally advised Clark that he was under arrest nothing at the scene changed, including the number of officers, the officers' demeanor, or the restriction of Clark's movement.  *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010).  This signals to the Court that Clark's "freedom of action" was earlier curtailed in the exact same manner as when Detective Melton eventually effectuated the "formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

Viewed objectively, "a reasonable [person] in [Clark]'s position would have understood his position" as being "in custody."  *Berkemer*, 468 U.S. at 422.  The Court therefore concludes that Clark was "in custody" from the moment he exited his vehicle and was handcuffed, meaning that *Miranda* warnings were required and should have been given before any questioning, or before making statements that were reasonably likely to elicit an incriminating response from Clark.

### 3.     The Officers' Questions Posed to Clark Constituted Custodial Interrogation

Once the officers had Clark "in custody," any "words or actions on the part of the police . . .that the police should [have] know[n] [we]re reasonably likely to elicit an incriminating response from [Clark]" should have been prefaced with *Miranda* warnings.  *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

Officer Berube's "express question[]" as to whether or not Clark was a felon was one that she "should [have] know[n] [was] reasonably likely to elicit an incriminating response" and

therefore required *Miranda* warnings.[12]  *See Innis*, 446 U.S. at 309, 301.  Although questioning about felon status will not always be reasonably likely to elicit an incriminating response, under these circumstances – that Officer Butler had alerted the other officers and Clark to seeing a firearm in the vehicle – an affirmative answer would clearly be incriminating.  It is illegal for a felon to be in possession of a firearm, *see* 18 U.S.C. § 922(g)(1), and knowledge of felon status is a required element of the felon in possession charge, *see* discussion *infra* Part II.C.5; *see also Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019) (identifying that in an illegal gun possession charge, the government must establish knowledge of felon status in addition to possession).  Clark added in response to Officer Berube's question that the Lexus was not his car, and that the firearm was his girlfriend's. (Govt. Ex. 3A, at 8:22:54–23:07).  This, too, could be incriminating as to the required knowledge of possession element for the felon in possession charge.  *See* discussion *infra* Part II.C.5; *see also Rehaif*, 139 S. Ct. at 2200; *Cf. United States v. Squirewell*, 346 Fed. App'x 959, 960 (4th Cir. 2009).

Officer Berube's question about whether Clark's felon status was not the end of Clark's custodial interrogation before he received his *Miranda* warnings.[13]  While Officer Berube was on

---

[12] The United States reports that although it believes Clark's two pre-*Miranda* statements are admissible, it will "not introduce either statement at trial" so as to "streamline" the suppression issues, in part because post-*Miranda* statements confirm the same. (ECF No. 49, at 10.)  The Court nonetheless includes its analysis of the admissibility of these statements to contextualize its later findings and because the United States does not concede their admissibility.

[13] As observed earlier in footnote 3, Clark broadly seeks to suppress "[a]ll spontaneous statements made by . . . Clark during his arrest and transport to the Richmond City Jail on February 10, 2022." (ECF No. 47, at 3-4.)  "During his arrest" is an ambiguous phrase that is difficult for the Court to discern what time period or statements Clark references.

As to the events in the alley and just afterward, Clark states that "[p]rior to his transport to the Richmond City Jail, [he] made spontaneous statements regarding the firearm and the car, including asking whether his girlfriend can come get her car." (ECF No. 47, at 15.)  This suggests that other unidentified statements might be encompassed by the motion, but the record

the phone confirming Clark's felon status, Officers Butler and Verbena continued to question Clark and secured further statements regarding his knowledge of the firearm and the contents of the Lexus. (Govt. Ex. 3A, at 8:23:09–8:24:10.)  The Officers should have known that questions regarding the firearm and other items that they believed Clark should not be in possession of under the law would illicit incriminating responses.

Even after Detective Melton formally advised Clark that he was under arrest, the detective engaged Clark in a conversation before reading Clark his *Miranda* rights.

> Detective Melton: you understand what's going on right?
>
> Clark: *unintelligible response*
>
> Detective Melton:  all that will be talked about later on, man, alright, but you understand right now that you are under arrest, you understand that right?
>
> Clark: *unintelligible response* . . . with the gun and all that sh*t and that come[s] back and that's my girl's gun, do you still gotta
>
> Detective Melton: you're a thirteen-time felon dude, . . . you're not supposed to be nowhere looking at a gun"
>
> Clark: yeah, that's her car though, I'm driving her car"
>
> Detective Melton: and you knew it was a gun there too.  You aren't supposed to be around a gun.

(Govt. Ex. 8A, at 13:35:53–36:24).  Detective Melton's statements were not casual conversation or statements about evidence which were not designed to illicit an incriminating response, *see United States v. Payne*, 954 F.2d 199, 201 (1992), but rather the "functional equivalent" of interrogation, *see Rhode Island v. Innis*, 446 U.S. 291, 309 (1980) (Stevens, J., dissenting).

---

does not show what statements might be implicated.  But, as previously noted, the Court does not see as "spontaneous" all of the statements Clark made at the scene of his arrest in addition to "yes" he is a convicted felon and "yeah" he is a 13-time felon.  Some could be deemed incriminating.

Accordingly, Officer Berube's question as to Clark's felon status and knowledge about the gun was a custodial interrogation that required *Miranda* warnings to adequately protect Clark's Fifth Amendment right against self-incrimination. Clark remained in custody throughout his questioning by Officers Butler and Verbena and Detective Melton and therefore those interrogations should have been prefaced with *Miranda* warnings as well.

Because the Court has determined that Clark was subject to a custodial interrogation without proper *Miranda* warnings, the Court turns to the issue of whether the RPD would have inevitably discovered the information learned from Clark's pre-*Miranda* statements.

### 4.    Legal Framework: The Inevitable Discovery Doctrine

"Generally, the government is prohibited from using evidence discovered in an unlawful [manner] against the individual whose constitutional right was violated." *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (citing *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011)). However, the inevitable discovery doctrine serves as an exception to this rule. *Id.* (citing *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017)).

Pursuant to the inevitable discovery doctrine, "the government [may] use evidence gathered in an otherwise unreasonable search if it can prove by a preponderance of the evidence that law enforcement would have ultimately or inevitably discovered the evidence by lawful means." *Seay*, 944 F.3d at 223 (internal quotation marks omitted) (quoting *Bullette*, 854 F.3d at 265). In that context, "[t]he burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010)).

**5.      The Officers Would Have Inevitably Discovered Clark Was a Felon, But Would Not Have Inevitably Secured Statements from Clark Regarding His Knowledge of His Felon Status**

Even though Officer Berube could not, without reading Clark his *Miranda* rights, interrogate him as to whether he was a felon, the officers would have inevitably discovered this fact. However, the court cannot conclude that officers would have inevitably discovered evidence of Clark's *knowledge* of his felon status, which is a required element of a felon in possession charge. Consequently, the Court will suppress Clark's statement that he is a felon.

This record clearly establishes that "in every case where a firearm is present, officers call Teletype to confirm an individual's criminal history." (ECF No. 49, at 16; Tr. 42:14–20.) The Court finds that, given the alacrity with which it occurred here, the suggested sequence of events certainly is more probable than not. *See Salem*, 647 F.3d at 116. Further, because the officers had probable cause to search Clark's vehicle whether he was a felon or not, the officers would inevitably discover Clark's criminal history during routine booking if he were arrested for the drugs found in the Lexus. The preponderance of the evidence shows that the officers would have inevitably checked Clark's criminal history after discovering the firearm in his possession.

However, the United States does not argue, and the Court cannot find by a preponderance of the evidence, that the officers would have inevitably secured statements from Clark regarding his knowledge of his felon status. For the United States to succeed on the Felon in Possession Count against Clark, it will need to prove that Clark "knew he belonged to the relevant category of persons barred from possessing a firearm" under 18 U.S.C. § 922(g), in this case, a person convicted of a felony. *See Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019). Clark's pre-*Miranda* warning statement that he is a felon, which shows his knowledge of his felon status, is incriminating as to this legal issue and the officers cannot knowledgably argue that Clark would

have inevitably revealed the same information had he been properly warned of his *Miranda* rights.

Accordingly, the Court will suppress Clark's statement that he is a felon.

### 6.     The Officers Would Not Have Inevitably Secured Statements from Clark Regarding His Knowledge of the Firearm

In his Motion to Suppress, Clark also asks the Court to suppress his remaining statements, other than his statement that he is a felon, that were made before receiving his *Miranda* warnings. The United States does not argue, and the Court cannot find by a preponderance of the evidence, that the officers would have inevitably secured Clark's numerous potentially incriminating statements regarding his knowledge of the firearm, ownership of the Lexus, and his use of marijuana, among other things.

Of particular note are Clark's statements regarding his knowledge of the firearm. For the United States to succeed on the Felon in Possession Count against Clark, it will need to prove Clark's constructive possession of the firearm.[14] *See United States v. Laughman*, 618 F.2d 1067, 1076–77 (4th Cir. 1980); *United States v. Squirewell*, 346 Fed. App'x 959, 960 (4th Cir. 2009). Whether Clark had the power to exercise dominion or control over the firearm and whether he had knowledge, inferred or otherwise, of the firearm's presence in the Lexus, is usually a question for the finder of fact. *See Squirewell*, 346 Fed. App'x at 960; *see also United States v. Lochan*, 674 F.2d 960, 966 (1st Cir. 1982). Clark's pre-*Miranda* statements regarding his prior knowledge of the firearm are incriminating as to this legal issue and the officers cannot establish

---

[14] There is constructive possession of contraband, such as a firearm, in a vehicle where "the defendant exercises, or has the power to exercise, dominion or control over the item," *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir. 1980), and has knowledge of the item's presence. *United States v. Squirewell*, 346 Fed. App'x 959, 960–61 (4th Cir. 2009). "Knowledge may be inferred from possession, that is, dominion and control over the area where the contraband is found." *Id.* (citing *United States v. Lochan*, 674 F.2d 960, 966 (1st Cir. 1982)).

that Clark would have inevitably revealed the same information had he been properly warned of his *Miranda* rights.

Accordingly, the Court will suppress the remainder of Clark's pre-*Miranda* warning statements made at the scene of his arrest.

**D.    Clark's Post-*Miranda* Statements at the Scene of His Arrest and During His Police Interview Will Not Be Suppressed as Fruit of the Poisonous Tree**

Clark has moved for the suppression of all statements, both at the scene of his February 10, 2022 arrest and the entirety of both post-arrest interviews, as fruit of the poisonous tree from Clark's unlawful seizure.[15] (ECF No. 47, at 30.) Clark makes alternative *Miranda* arguments in support of suppressing his statements in response to custodial interrogation at the arrest scene on February 10, 2022 and his statements during his July 1, 2022 post-indictment interview, however, he states that if the Court "make[s] a finding in support of reasonable suspicion, [he] will not challenge the admissibility of spontaneous statements" made at the scene of his arrest and during his transport to the Richmond City Jail.(ECF No. 47, at 30, n.8.)

While Clark does not specify which pre-*Miranda* warning statements he deems "spontaneous," the Court finds it proper, after its finding that officers had reasonable suspicion to detain Clark, to deny the Motion to Suppress as to the statements Clark made at the scene of his February 10, 2022 arrest and during his police interview *after* receiving his *Miranda* rights because the statements were made after a proper *Miranda* warning and Clark's original unwarned statements were not coerced. *See Oregon v. Elstad*, 470 U.S. 298, 314 (1985) (If an individual makes additional incriminating statements after having been read their *Miranda* rights,

---

[15] Although Clark has indicated that he will not seek suppression of statements as fruit of the poisonous tree if the Court were to conclude that the initial stop was reasonable, (ECF No. 47, at 30 n.8), the Court nonetheless speaks to this argument to create a full record.

47

the "fruit of the poisonous tree" doctrine will only exclude the subsequent statements if the police employed "deliberately coercive or improper tactics in obtaining the initial statement."). Thus, the Court will not suppress the statements Clark made at the scene of his arrest, during his transport, or in his subsequent February 10, 2022 police interview after he received his *Miranda* warnings.

### E. Clark's Post-Indictment Interview Statements Will Be Suppressed Due to His Invalid *Miranda* Waiver

In contrast, the Court will grant the Motion to Suppress all the statements Clark made during his July 1, 2022 post-indictment interview with federal officers because, although Clark was advised of his *Miranda* rights and he signed a waiver form, his waiver was unclear, meaning it did not constitute a knowing and intelligent waiver. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### 1. Legal Framework: *Miranda* Waivers

In encounters that require *Miranda* warnings, an individual may waive their rights and voluntarily submit to custodial interrogation. "The inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions." *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002) (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). "First, the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Second, 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

To determine whether an individual made an "uncoerced choice" and had the "requisite level of comprehension" to waive their *Miranda* rights validly, the Court must analyze the

totality of the circumstances surrounding the interrogation. *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The circumstantial factors to be analyzed can include the defendant's intelligence, *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005), age, education and familiarity with the criminal justice system, *Corell v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995), physical and mental condition, *Mincey v. Arizona*, 437 U.S. 385, 399–400 (1978), and the influence of drugs, *Cristobal*, 293 F.3d at 142.

"An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but it is not inevitably . . . sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Compare Montejo v. La.*, 556 U.S. 778, 786 (2009) ("[W]hen a defendant is read [their] *Miranda* rights . . . and agrees to waive those rights, that typically does the trick.") *and United States v. Umaña*, 750 F.3d 320, 344 (4th Cir. 2014) (waiver valid because defendant responded "yes" when asked if understood rights and willingly answered questions), *with Gilliam v. Sealey*, 932 F.3d 216, 236–37 (4th Cir. 2019) (waiver invalid, despite defendants' signed *Miranda* waivers and written confessions, because officers induced confessions using promises and threats) *and Koh v. Ustich*, 933 F.3d 836, 846 (7th Cir. 2019) (waiver invalid, despite defendant signing *Miranda* waiver form and nodding in a way that officer perceived that defendant understood rights because defendant lacked understanding due to language barrier) *and Hart v. Att'y Gen. of Fla.*, 323 F.3d 884, 893–95 (11th Cir. 2003) (waiver invalid, despite defendant being explained *Miranda* rights and signing waiver, because detective contradicted *Miranda* warning and defendant did not understand nature of right against self-incrimination or consequences of waiver).

### 2.     Clark's *Miranda* Waiver in His Post-Indictment Interview Was Voluntary, But Not Knowing

Clark does not argue that his *Miranda* waiver at his post-indictment interview was involuntary. Instead, he argues that he did not have a "full awareness of both the nature of the right [to remain silent] being abandoned and the consequences of the decision to abandon it." (ECF No. 47, at 34.) The Court agrees that Clark did not possess the "requisite level of comprehension" to validly waive his right to remain silent. *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Clark's decision to sign the *Miranda* waiver form is "strong proof" of the validity of his waiver but it is not conclusive. *See Butler*, 441 U.S. at 373. After TFO Kielb read the waiver form aloud and asked Clark if he understood, Clark "indicat[ed] with his hands like to hand over the paper and the pen. That he was willing to sign." (Tr. 95:21–96:3.) However, once Clark had the form, he questioned what he was waiving and unequivocally stated, "I ain't trying to waive my rights." (Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 12:00.) Even after Clark ultimately signed the waiver, he attempted to make sure TFO Kielb understood that he was not trying to waive his rights. (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:40.)

Despite Clark's interruption and protestations that he understood, Clark's subsequent statements clearly indicate that he did not. (Govt. Ex. 11B, at 1; Govt. Ex. 11A, at 12:23.) Clark's conduct when executing the *Miranda* waiver form would prompt a reasonable officer to conclude that Clark did not understand what he was signing. *See Koh v. Ustich*, 933 F.3d 836, 846 (7th Cir. 2019) (holding that a reasonable officer should have concluded the defendant did not understand the waiver form because he nodded that he understood and then asked an officer to translate). Importantly, TFO Kielb –likely unintentionally—mischaracterized exactly what rights Clark was waiving by stating that Clark was "not waiving any other rights except to have

counsel here present at this time." (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:25.) Even after saying Clark need not talk at all, TFO Kielb sufficiently blurred the upshot of Clark's decision so as to render Clark's waiver unknowing.

The United States submits that Clark's extensive criminal history and experience with the criminal justice system precludes the possibility that he did not understand the rights he was waiving. (ECF No. 49, at 24–26.) Clark has been convicted of multiple felonies and had his *Miranda* rights read to him before, but constitutional rights do not abate after five, thirteen, or even twenty prior arrests. Regardless, it is not clear that Clark had much experience with the federal sentencing guidelines, federal charges, or interviews with the purpose of securing his cooperation even if the Court were to look to his past arrests for information.[16]

While discussions of the benefits of cooperation in a police interview do not render a defendant's statements involuntary, *see United States v. Santiful*, 701 Fed. App'x 242, n.* (4th Cir. 2017) (citing *United States v. Mashburn*, 406 F.3d 303, 309–10 (4th Cir. 2005); *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987)), statements have been deemed improperly obtained when they arise after false assurances that a defendant's statements may not be used against him, *see Santiful*, 701 Fed. App'x at n.* (citing *Hart v. Att'y Gen. of Fla.*, 323 F.3d 836, 894–95 (11th Cir. 2003) (holding that after a careful explanation of each *Miranda* right and a signed waiver form, the defendant's inquiry into the pros and cons of hiring a lawyer did not amount to an unequivocal request for counsel but indicated that the defendant did not fully understand his right to counsel and sought clarification; the officer's suggestion that a con of

---

[16] Clark mentions only that his brother attempted to explain to him the point system of the Sentencing Guidelines. (Govt. Ex. 11A, at 32:49.) Indeed, during the interview Clark asked Kielb, "that machinegun charge, what the hell is that? . . . I aint' have that charge . . . in the state." (Govt. Ex. 11B, at 3.)

having a lawyer was that they would tell the defendant not to answer questions and that "honesty wouldn't hurt him" directly contradicted the protections that *Miranda* established.))

In this case, TFO Kielb erroneously stated that Clark was "not waiving any other rights except to have counsel here present at this time." (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:25.) In fact, Clark was also waiving the right to remain silent and to assure that statements could not be used against him in court. TFO Kielb further contradicted the *Miranda* warning by responding to Clark's express desire not to waive his rights with "No, no, no . . . I want to have honest conversation right here and . . .this is where you can help yourself out, okay?" (Govt. Ex. 11B, at 2; Govt. Ex. 11A, at 12:46.) Similar to the officer in *Hart*, TFO Kielb's assurances that the interview would be an opportunity for Clark to help himself is not compatible with the warning that Clark's statements can be used *against* him. 323 F.3d at 894.

Given the totality of the circumstances surrounding the interrogation, including any statements by law enforcement that were incompatible with the *Miranda* warnings, the Court cannot find that Clark's decision to waive his rights was knowing and intelligent. The statements made during Clark's post-indictment interview therefore must be suppressed.

### III.  Conclusion

For the foregoing reasons, the Court denies in part and grants in part Clark's Combined Motion to Suppress.

An appropriate Order shall issue.

Date: 8/18/2023
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge